J-A27001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 957 EDA 2019 |

Appeal from the Orders Entered February 27, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001013-2016,
FID: 51-FN-001755-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 960 EDA 2019 |

Appeal from the Orders Entered February 27, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001014-2016,
FID: 51-FN-001755-2014

BEFORE:   BOWES, J., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 24, 2020**

T.T. ("Mother"), appeals from the orders entered on February 27, 2019,

reinstating two decrees originally entered on May 2, 2017, that involuntarily

_____

[*] Retired Senior Judge assigned to the Superior Court.

terminated Mother's parental rights to her sons, L.R.J.P. and J.M.C.P.[1] After careful review, we affirm.

The relevant procedural and factual history are as follows. L.R.J.P. and J.M.C.P. were born in August 2007 and December 2011, respectively. The Philadelphia Department of Human Services ("DHS") became involved with the family in 2014, primarily due to allegations that L.R.J.P.'s and J.M.C.P.'s sister, C.P., was sexually abused by several other siblings.[2] N.T., 11/14/16, at 13; DHS Exhibit 8, Report of Forensic Evaluation, 7/28/15, at 2-3. C.P. was adjudicated dependent on August 8, 2014.[3] Thereafter, DHS monitored the conditions in the home, receiving additional reports that L.R.J.P. and J.M.C.P. had inadequate housing, were truant, and lacked mental health, medical, and dental treatment. N.T., 11/14/16, at 13. On December 24, 2015, L.R.J.P. and J.M.C.P. were adjudicated dependent. Following L.R.J.P.'s and J.M.C.P.'s adjudication, the children remained in their home with DHS providing in-home supervision. *Id*. at 61. On March 22, 2016, the trial court transferred legal custody of L.R.J.P. and J.M.C.P. to DHS and ordered the children to be placed in foster care.

_____

[1] The trial court previously entered decrees involuntarily terminating the parental rights of B.P. ("Father"), who is the father of L.R.J.P. and J.M.C.P. Father appealed the involuntary termination of his parental rights. This Court affirmed the decrees and Father is not a party to this appeal.

[2] The record indicates that, in addition to their sister, C.P., L.R.J.P. and J.M.C.P. have four brothers who are not parties to the these proceedings..

[3] Mother's parental rights to C.P. were involuntarily terminated on September 13, 2016.

To assist in reunifying the family, DHS instituted a single case plan ("SCP"). Mother's objectives were to maintain visitation, remain drug free, stabilize her mental health, attend parenting and domestic violence programs, and obtain appropriate housing. *Id*. at 15-17. Additionally, Mother was ordered to participate in substance abuse and mental health treatment. *Id*. at 15. Mother made some progress towards complying with her goals. In particular, Mother completed a domestic violence program and was consistent with her visits. *Id*. at 14-15, 19. However, Mother initially failed to complete a substance abuse or mental health program. *Id*. at 15-17. Further, she failed to complete parenting classes or obtain appropriate housing. *Id*. at 17-19.

On October 26, 2016, DHS filed petitions to involuntarily terminate Mother's parental rights to L.R.J.P. and J.M.C.P. The trial court held hearings on the petitions on November 14, 2016, February 16, 2017, March 10, 2017, and May 2, 2017. During the proceedings, DHS presented the testimony of Dr. William Russell, who completed parenting capacity evaluations, Jennifer Rollins, the CUA case manager supervisor, and Dominique Bibbs, the CUA case manager. Mother did not testify. Shannon Parker, Esquire, the court appointed advocate for L.R.J.P. and J.M.C.P.'s, presented the testimony of Jessica Spurgeon, a child advocate social worker.

At the initial hearing on November 14, 2016, Ms. Bibbs offered testimony regarding the family's history with DHS, as well as Mother's SCP objectives and compliance. Ms. Bibbs testified that Mother completed a

domestic violence program at the Achieving Reunification Center ("ARC"), but declined employment or housing services. N.T., 11/14/16, at 62. Ms. Bibbs further testified that Mother enrolled in substance abuse and mental health treatment, as well as parenting classes. *Id*. at 15-16. While in treatment, Mother's drug screens were negative. *Id*. at 16. However, Mother ended her participation when she moved to Delaware in the summer of 2016. *Id*. at 15-16. Ms. Bibbs believed that Mother moved to Delaware because she was evicted from her home. *Id*. at 63. Ms. Bibbs acknowledged that Mother attended dual diagnosis treatment in Delaware, but stated that she had no way of determining Mother's progress. *Id*. at 16, 65-66. Ms. Bibbs testified that Mother did not successfully complete a dual diagnosis program. *Id*. at 15. Overall, Ms. Bibbs considered Mother's compliance as moderate. *Id*. at 22.

With respect to visitation, Ms. Bibbs testified that Mother attended the supervised visitations consistently. *Id*. at 19. She observed that L.R.J.P. and J.M.C.P. know Mother as "mom," and run to her in excitement. *Id*. at 20. Further, Ms. Bibbs testified that L.R.J.P. and J.M.C.P. indicated a desire to go home. *Id*. at 81. However, she also noted that L.R.J.P. and J.M.C.P. never requested to contact Mother outside of the supervised visitations. *Id*. at 26. At the time, Ms. Bibbs did not believe that Mother was ready to progress beyond supervised visitation. *Id*. at 20. In support, Ms. Bibbs explained that Mother was very emotional at visits and that the visits were reduced from three hours to one hour due to Mother's lack of control over L.R.J.P. and

J.M.C.P. *Id*. at 67-68, 70. A further concern was that Mother acknowledged that she filled L.R.J.P.'s prescription medication and then sold it on the street. *Id*. at 71.

Ms. Bibbs opined that reunification was not possible because Mother did not have appropriate housing, did not complete a mental health or substance abuse program, and did not successfully complete parenting classes. *Id*. at 27-28. Although Ms. Bibbs acknowledged that L.R.J.P. and J.M.C.P. have a good relationship with Mother and are bonded with her, she believed that Mother acted as a friend rather than a parent. *Id*. at 29-30. Ms. Bibbs testified that L.R.J.P. and J.M.C.P. would suffer harm if Mother's rights were terminated, but that the harm would not be irreparable. *Id*. at 30-31.

On February 16, 2017, Dr. Russell testified regarding the parenting capacity evaluation he performed in April 2015. N.T., 2/16/17, at 11-13. Mother's presentation at the evaluation caused Dr. Russell concern, as Mother indicated that she suffered from stability issues, sleep disturbance, and emotional instability. *Id*. at 14-15. Mother appeared for the interview dressed inappropriately, and endorsed previous auditory hallucinations. *Id*. at 27-28. Mother suggested that she experienced an unstable emotional state over the course of her childhood, and had received prior mental health treatment. *Id*. at 16-17. However, at the time of the evaluation, Mother was receiving no mental health treatment or medication. *Id*. at 15.

During the interview with Dr. Russell, Mother disclosed that she lost her home to foreclosure, and that her only income came from social security

benefits. *Id*. at 16. Mother also told Dr. Russell that, on occasion, parenting her children was overwhelming for her. *Id*. at 29. Mother informed Dr. Russell that she frequently left her children alone in the home. *Id*. at 16. Further, Mother reported that she was fearful of Father, who was emotionally and verbally abusive. *Id*. at 14-15. Mother also disclosed a history of substance abuse involving marijuana. *Id*. at 13-14.

Dr. Russell could not render a diagnosis because he believed that Mother needed mental health treatment prior to receiving a definitive diagnosis. *Id*. at 16-17. Dr. Russell opined that Mother could not provide L.R.J.P. and J.M.C.P. with safety and permanency at that time because of her substance abuse, unstable housing, mental instability, and inappropriate supervision. *Id*. at 17. However, Dr. Russell believed that Mother could provide stability and safety if Mother followed his recommendations and obtained consistent substance abuse and mental health treatment. *Id*. at 18.

At the February 16, 2017 hearing, Jennifer Rollins, the CUA case manager supervisor, provided an update on Mother's progress. Ms. Rollins testified that Mother's compliance with the SCP was moderate. *Id*. at 46-47. Ms. Rollins reported that Mother completed a parenting course. *Id*. at 45. Further, Mother began attending mental health treatment, albeit inconsistently. *Id*. However, Mother was not receiving substance abuse treatment. *Id*. With respect to Mother's housing, Ms. Rollins testified that Mother was homeless, but occasionally stayed with her sister. *Id*. at 45-46.

Ms. Rollins testified that Mother consistently attended her supervised visitation. *Id*. at 46. Ms. Rollins did not recommend unsupervised visitation because Mother became very emotional during the visits and could not safely manage the children. *Id*. at 57-58. Based on her observation of Mother's deficient parental capacity, Ms. Rollins testified that there was no improvement in Mother's parenting skills after Mother completed the parenting program. *Id*. at 57. Additionally, Ms. Rollins opined that neither L.R.J.P. nor J.M.C.P. would suffer irreparable harm if the trial court involuntarily terminated Mother's parental rights. *Id*. at 47.

The trial court concluded the testimonial hearings on March 10, 2017. Jessica Spurgeon, the child advocate social worker, testified that she became involved with the family in August 2014. N.T., 3/10/17, at 12. Ms. Spurgeon recalled that when she visited L.R.J.P. and J.M.C.P. in their home in December 2015, the home was dirty, L.R.J.P. and J.M.C.P. were running around screaming, and Mother appeared dazed. *Id*. at 13. Mother informed Ms. Spurgeon that she was overwhelmed and was not participating in therapy or medication management. *Id*.

As the case proceeded, Ms. Spurgeon discussed with L.R.J.P. and J.M.C.P. what their preferred outcomes would be. L.R.J.P. expressed that he wanted to go home with Mother and Father, but would be "okay" staying in the foster home. *Id*. at 17. J.M.C.P. told Ms. Spurgeon, "I want to be where I'm supposed to be." *Id*. Ms. Spurgeon opined that involuntarily terminating Mother's parental rights met L.R.J.P.'s and J.M.C.P.'s best interests because

Mother could not meet her SCP goals and provide for L.R.J.P.'s and J.M.C.P.'s educational, mental health, and basic daily needs. *Id*. at 19. Ms. Spurgeon believed that there would be no irreparable harm if Mother's parental rights were terminated, and that any potential harm could be mitigated by L.R.J.P.'s and J.M.C.P.'s foster parent. *Id*. at 19-20.

After the close of testimony, the trial court reconvened on May 2, 2017, to deliver its findings of fact and conclusions of law on the record. The trial court concluded that termination of Mother's parental rights was appropriate pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). N.T., 5/2/17, at 8. Further, the trial court determined that there would be no irreparable harm to L.R.J.P. or J.M.C.P., and that there was no parental bond with Mother beyond that of an acquaintance. *Id*. Accordingly, on May 2, 2017, the trial court entered decrees involuntarily terminating Mother's parental rights to L.R.J.P. and J.M.C.P.[4] The court also changed the permanent placement goals for L.R.J.P. and J.M.C.P. to adoption. Mother timely filed notices of appeal and concise statements of errors complained of on appeal.[5]

---

[4] The trial court, in its decree, also terminated Mother's parental rights pursuant to § 2511(a)(8). However, in its opinion, the trial court states that it "did not terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), although the Decree of Involuntary Termination of Parental Rights as to Mother incorrectly lists 23 Pa.C.S.A. § 2511(a)(8) as a subsection for the basis of termination." Trial Court Opinion, 6/25/19, at 9.

[5] Mother did not appeal the orders changing the permanent placement goals of L.R.J.P. and J.M.C.P. to adoption.

By memorandum dated October 25, 2018, this Court vacated the decrees involuntarily terminating Mother's parental rights and remanded the cases to the trial court. In vacating the decrees, this Court concluded, "nowhere in the certified record is there an indication that Attorney Parker was serving in a dual role representing [L.R.J.P.'s and J.M.C.P.'s] best interests and legal interests." *Interest of L.R.J.P.*, No. 1664 EDA 2017, unpublished memorandum at 9 (Pa.Super. filed Oct. 25, 2018). Further, there was no indication that Attorney Parker met with or interviewed L.R.J.P. or J.M.C.P. regarding their preferred outcomes. *Id*. at 9-10. Additionally, this Court observed, "a conflict may have existed between counsel's support of the termination petition and [L.R.J.P.'s and J.M.C.P.'s] preferred outcome." *Id*. at 10. We instructed:

> On remand, the Family Court shall appoint separate legal-interests counsel for [L.R.J.P. and J.M.C.P.]. Such counsel must attempt to ascertain [L.R.J.P.'s and J.M.C.P.'s] preferred outcome as to Mother by directly interviewing [L.R.J.P. and J.M.C.P.], following their direction to the extent possible, and advocating in a manner that comports with [L.R.J.P.'s and J.M.C.P.'s] legal interests. Counsel should discern from [L.R.J.P. and J.M.C.P.] whether they prefer adoption by their foster parents if the adoptive family does not support continued contact with Mother. If [L.R.J.P. and J.M.C.P.] are unable to express clearly their position as to Mother or direct counsel's representation to any extent, counsel shall notify the court. We observe that [L.R.J.P. and J.M.C.P.] may have differing preferred outcomes as to Mother, in which case counsel shall inform the court, and the court shall appoint additional legal-interests counsel, so that each child is represented separately, and conduct further proceedings consistent with this memorandum.
>
> Once a preferred outcome is identified, counsel shall notify the Family Court whether termination of Mother's parental rights

is consistent with [L.R.J.P.'s and J.M.C.P.'s] legal interests. If [L.R.J.P.'s and J.M.C.P.'s] preferred outcome is consistent with the result of the prior termination proceedings, the court shall re-enter its May 2, 2017, orders as to Mother. If the preferred outcome is in conflict with the prior proceeding, the court shall conduct a new termination hearing as to Mother only to provide [L.R.J.P.'s and J.M.C.P.'s] legal counsel an opportunity to advocate on behalf of [L.R.J.P.'s and J.M.C.P.'s] legal interests. ***See T.M.L.M.***, 184 A.3d [585, 591 (Pa.Super. 2018)] (ordering that trial court shall conduct a new hearing only if it serves the "substantive purpose" of providing the child with the opportunity to advance his legal interests through new counsel).

Orders vacated without prejudice to permit the Family Court to re-enter the original orders if a new termination hearing is not required. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

***Id***. at 11-12.

Upon remand, the trial court issued orders dated December 27, 2018, appointing Attorney Neil Masciantonio as legal counsel for L.R.J.P. and J.M.C.P. Orders, 12/27/18. The orders required Attorney Masciantonio to visit with L.R.J.P. and J.M.C.P. to ascertain their preferred outcomes. ***Id***. Subsequently, the trial court held a hearing on February 27, 2019.[6] Attorney Masciantonio informed the trial court that he had met with L.R.J.P. and J.M.C.P. approximately one month prior to the hearing. N.T., 2/27/19, at 20-21. The trial court then permitted Attorney Masciantonio to disclose L.R.J.P.'s

---

[6] The record suggests that, in advance of the hearing, Mother's counsel issued subpoenas to have L.R.J.P. and J.M.C.P testify, which the trial court quashed pursuant to a motion to quash filed by L.R.J.P.'s and J.M.C.P.'s guardian *ad litem*, Attorney Shannon Sherwood. N.T., 2/27/19, at 5-16. Neither the subpoenas nor the motion to quash is included in the certified record.

and J.M.C.P.'s preferred outcomes over hearsay objections from Mother's counsel. *Id*. at 15-16, 21-24.

Attorney Masciantonio disclosed that L.R.J.P. would like to stay in his current foster home and that his preferred outcome would be adoption. *Id*. at 21. Further, L.R.J.P. asserted that he would be "okay" if he could not visit with Mother because the visits would be too sad. *Id*. at 22. Although Attorney Masciantonio described J.M.C.P. as "all over the place," J.M.C.P. eventually expressed that his preferred outcome would also be adoption. *Id*. at 22-23.

Following Attorney Masciantonio's presentation, DHS's counsel, Attorney Kathleen Kim, began to question the CUA representative, Rosezina Moy, with regard to the permanency review hearing that the trial court scheduled to occur contemporaneously. *Id*. at 24. Mother's counsel attempted to cross-examine Ms. Moy. *Id*. at 25-26. However, the trial court precluded him from doing so, noting that L.R.J.P.'s and J.M.C.P.'s preferred outcome was consistent with the prior termination of Mother's parental rights, and that it would reinstate the prior termination decrees. *Id*. For essentially the same reason, the trial court rejected Mother's request to present the testimony of her other sons, and to mark trial exhibits. *Id*. at 26-29.

On February 27, 2019, the trial court entered orders reinstating the decrees involuntarily terminating Mother's parental rights to L.R.J.P. and

J.M.C.P.[7]  Mother filed separate notices of appeal and concise statements of

errors complained of on appeal, which we consolidated *sua sponte*.

On appeal, Mother raises the following issues for our review:

1. Whether the [t]rial [c]ourt erred in not allowing [a]bove [c]aptioned [m]inor [c]hildren to appear, in having granted (pursuant to Subpoena) the Opposition "Motion to Quash..."

2. Whether the [t]rial [c]ourt erred in allowing into evidence the out of court remarks of [a]bove [c]aptioned [m]inor [c]hildren in that [L.R.J.P.'s and J.M.C.P.'s] testimony was presented to the [c]ourt through [L.R.J.P.'s and J.M.C.P.'s] [c]ounsel.

3. Whether the [t]rial [c]ourt erred in terminating [Mother]'s parental rights (in that the decision had not been based on competent evidence).

4. Whether the [t]rial [c]ourt erred in not allowing introduction into evidence certified . . .  copies of prior Court Orders under No.'s DP-3318-2015 and DP-3319-2015, relating to [Mother]'s two other sons ([L.R.J.P.'s and J.M.C.P.'s]  siblings); and moreover, not entertaining an Offer of Proof.

5. Whether the [t]rial [c]ourt erred in not allowing the other siblings, who were referenced in "Item 4.," and who had been present and were prepared to speak, to provide testimony; likewise also, not accepting any Offer of Proof.

6. Whether the [t]rial [c]ourt . . . erred in not permitting the [c]aseworker (following her having been subject to direct examination) to be cross-examined by [Mother]'s Counsel.

Mother's brief at 5 (italics omitted).

_____

[7] The orders reinstating the termination decrees are captioned "Continuance Order."

Mother's issues pertain to the trial court's evidentiary rulings. The standard of review of a trial court's admission or exclusion of evidence is well established:

These matters are within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, [t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Jacobs v. Chatwani*, 922 A.2d 950, 960 (Pa.Super. 2007).

As Mother's first, second, and third issues are interrelated, we address them collectively. In her first issue, Mother argues that the trial court should have permitted her to present the testimony of L.R.J.P. and J.M.C.P. Mother's brief at 11. She argues that the record evidence suggested that L.R.J.P. and J.M.C.P. were excited to see Mother at the supervise visitation and expressed a desire to go home. *Id*. Further, Mother observes that there was no evidence that L.R.J.P. or J.M.C.P. would suffer trauma if required to testify about their preferences. *Id*. In her second and third issues, Mother argues that the testimony of Attorney Masciantonio regarding L.R.J.P.'s and J.M.C.P.'s preferred outcomes constituted inadmissible hearsay, and that Attorney Masciantonio should have visited L.R.J.P. and J.M.C.P. on more than one occasion. *Id*. at 12-13.

Here, the trial court concluded that it did not err, reasoning:

- 13 -

> When a child has a preferred outcome that is ascertainable, counsel, that is representing the child's legal interest, should place on the record the child's preferred outcome, after appropriate consultation with the child. *In re K.R.*, 200 A.3d 969, 985 (Pa. Super. 2018). The Superior Court of Pennsylvania has previously determined that they "... do not believe that the Supreme Court of Pennsylvania would mandate that children in these hearings must testify under the rationale that it would otherwise be permitting inadmissible hearsay. Such a decision would likely cause additional distress and long-lasting, if not permanent, emotional impact on children. Such a mandate appears inconsistent with the Supreme Court's directive in the *L.B.M.* case, which imposes the utilization of child-directed legal counsel." *In re B.J.Z.*, [207 A.3d 914] (Pa. Super. Apr. 4, 2019).

Trial Court Opinion, 6/25/19, at 20-21. For the following reasons, we agree.

In *In re B.J.Z.*, *supra*, this Court rejected arguments nearly identical to Mother's. In *In re B.J.Z.*, the trial court involuntarily terminated the parental rights of the father and, on appeal, the father argued, *inter alia*, that the trial court erred by allowing the children's legal counsel to convey the children's preferred outcome to the court. *Id*. at 917. The father argued that, by doing so, the trial court improperly allowed inadmissible hearsay. *Id*. The father further argued that the trial court erred when it failed to speak to the children directly or allow the father to question the children. *Id*. This Court rejected the father's arguments, holding that the trial court did not err "in allowing [the c]hildren's legal interest-counsel to provide the court with information as to [the c]hildren's position on the question of parental termination." *Id*. at 920. Moreover, this Court concluded, "testimony as to what a child tells other people is admissible in order to establish that child's mental state at the time he or she made the comment." *Id*. at 920, *citing In*

- 14 -

*re Child M.*, 681 A.2d 793, 800 (Pa.Super. 1996). Further, this Court observed that it has "declined to create a requirement that 'would entitle a natural parent to force an abused child to testify in an involuntary termination proceedings.'" *In re B.J.Z.*, *supra* at 920.

Moreover, with respect to the appointment of legal counsel, our Supreme Court, in *In re Adoption of L.B.M.*, 161 A.3d 172, 183 (Pa. 2017) (plurality), held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings. The Court noted that legal interests are synonymous with the child's preferred outcome, but the child's best interests are determined by the court. *Id*. "When a child has a preferred outcome that is ascertainable, counsel representing a child's legal interests, after appropriate consultation with the child, should place on the record the child's preferred outcome." *In re: K.R.*, 200 A.3d 969, 985–86 (Pa.Super. 2018).

Our review of the record confirms that the trial court did not abuse its discretion in denying Mother's request to call L.R.J.P. and J.M.C.P. as witnesses. While Mother argues that the children would not have been traumatized by testifying, the trial court acted within its discretion by not requiring L.R.J.P. and J.M.C.P. to testify directly regarding their preferred outcomes. Consistent with our remand directive, Attorney Masciantonio adequately conveyed L.R.J.P.'s and J.M.C.P.'s preferences to the trial court. In this vein, we reject Mother's argument that Attorney Masciantonio was

required to meet with L.R.J.P. and J.M.C.P. more than once. Attorney Masciantonio's representation satisfied the specific requirements of our remand order as he met with his clients, discerned their preferred outcomes, and conveyed those preferences to the trial court. That is precisely what he was instructed to do. Discerning no error of law or abuse of discretion, we conclude that Mother's first, second, and third issues lack merit.

In her fourth and fifth issues, which we address together, Mother contends that the trial court erred by precluding her from introducing orders concerning to the unrelated dependency cases involving L.R.J.P.'s and J.M.C.P.'s siblings, and by precluding those siblings from testifying at the remand hearing. Mother's brief at 13-15. Mother infers that this failure constitutes a denial of due process. *Id*. at 13-14. She asserts that the unrelated dependency orders demonstrate that she satisfied all of her SCP goals that were created in that case, and that the findings of dependency as to those children were discharged. *Id*. at 14. Similarly, Mother contends that the trial court erred by failing to allow L.R.J.P.'s and J.M.C.P.'s siblings to be called as witnesses concerning their contact with L.R.J.P. and J.M.C.P. *Id*. at 15.

Mother's arguments relate to the scope of the remand hearing. The following principles apply.

> The issue of whether a trial court properly interpreted the scope of a remand order is a matter of law. *See In re Lokuta*, 608 Pa. 223, 11 A.3d 427, 438 (2011), *cert. denied*, 565 U.S. 878, 132 S.Ct. 242, 181 L.Ed.2d 138 (2011). As in all appeals raising

matters of law, "our standard of review is *de novo*, and our scope of review is plenary." **Schwartz v. Rockey**, 593 Pa. 536, 932 A.2d 885, 891 (2007).

"[A] trial court has an obligation to comply scrupulously, meticulously, and completely with an order of [the appellate court] remanding a case to the trial court." **Commonwealth v. Williams**, 877 A.2d 471, 474 (Pa. Super. 2005), *appeal denied*, 586 Pa. 770, 895 A.2d 1261 (2006) (citation omitted). The trial court is required to "strictly comply with the mandate of the appellate court." **Id**. at 474–75 (citation omitted). Issues not included in the mandate cannot be considered by the trial court. **See id**. at 475.

**Carmen Enterprises, Inc. v. Murpenter, LLC**, 185 A.3d 380, 389 (Pa.Super. 2018); **see also Commonwealth v. Null**, 186 A.3d 424, 429 (Pa.Super. 2018) (holding that the trial court erred in referring the parties to mediation because this Court only remanded for the "[trial] court to consider whether the fine was excessive, to decide whether additional evidence is necessary, and to enter a new order.").

Here, the trial court noted that the hearing on February 27, 2019 was initially limited to determining the legal interests of L.R.J.P. and J.M.C.P. N.T., 2/27/19, at 8-9. Accordingly, after ascertaining that L.R.J.P.'s and J.M.C.P.'s legal interests comported with the prior termination decrees, the trial court rejected Mother's attempt to introduce additional testimony or evidence concerning the termination of her parental rights, noting that the remand hearing was for "a limited purpose." **Id**. at 26-28. Again, we agree.

Instantly, this Court vacated the prior termination decrees and remanded with specific instructions. First, this Court required the trial court

to appoint legal counsel for L.R.J.P. and J.M.C.P., and instructed legal counsel to meet with L.R.J.P. and J.M.C.P. to determine their preferred outcomes. If the children's preferences were consistent with the termination of parental rights, the court was directed to reinstate the prior decree. *Interest of L.R.J.P.*, No. 1664 EDA 2017, unpublished memorandum at 11 (Pa.Super. filed Oct. 25, 2018). Further, "Once a preferred outcome is identified, counsel shall notify the Family Court whether termination of Mother's parental rights is consistent with [L.R.J.P.'s and J.M.C.P.'s] legal interests. If [L.R.J.P.'s and J.M.C.P.'s] preferred outcome is consistent with the result of the prior termination proceedings, the court shall re-enter its May 2, 2017, orders as to Mother." *Id*. at 12.

While Mother couches her argument as one involving due process, "Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa.Super. 2005). Here, Mother received notice of the hearing, appeared, and was represented by counsel. However, the scope of the remand hearing was limited to a determination of whether legal counsel had ascertained L.R.J.P.'s and J.M.C.P.'s preferred outcomes, and whether their preferred outcomes were consistent with the prior termination decrees. Only if legal counsel ascertained that L.R.J.P.'s or J.M.C.P.'s preferred outcomes were inconsistent with the prior decrees did this Court permit the trial court to conduct a new

hearing. The trial court scrupulously complied with our prior order, appropriately determined that the termination decrees should be reinstated, and refused to take additional evidence. Upon review, based on the limited issue to be decided on remand, we conclude that the trial court did not err in denying Mother's request to present witnesses or exhibits.

In her sixth issue, Mother contends that the trial court erred by refusing to permit Mother to cross-examine the CUA caseworker, Ms. Moy, during the portion of the February 27, 2019 hearing that was relevant to the periodic permanency review in the children's the ongoing dependency cases. Mother's brief at 15. Mother argues that, even if the hearing was initially limited to discerning the children's respective legal interests, DHS's questioning of Ms. Moy on direct examination "opened the door," to further inquiry and Mother should have been permitted to cross-examine Ms. Moy. *Id*. Mother submits that the failure to allow her to cross-examine Ms. Moy denied her due process. *Id*.

The trial court rejected Mother's argument, observing:

> The hearing on February 27, 2019, included a hearing pursuant to the adoption docket as well as the dependency docket. The hearing pursuant to the adoption docket was limited in scope to address the matters on remand from the Superior Court of Pennsylvania. There was no matter remanded by the Superior Court of Pennsylvania regarding [L.R.J.P.'s and J.M.C.P.'s] dependency matter because Mother's [c]ounsel never appealed the goal change on May 2, 2017.

Trial Court Opinion, 6/25/19, at 22.

In contrast to the remand hearing to determine whether a conflict exists between the children's legal interest and best interests, the purpose of the permanency review hearing was to review the permanency plan for L.R.J.P. and J.M.C.P., determine the date by which the goal of permanency might be achieved, and consider whether placement continues to be best suited to the safety, protection, and physical, moral, and mental welfare of L.R.J.P. and J.M.C.P. *See* 42 Pa.C.S. § 6351(e)(1). Importantly, to the extent that Mother retained her parental rights in this case pending the remand hearing and the orders reinstating the termination decrees, the prior goal change order did not divest Mother of standing under the Juvenile Act, which confers party status to, *inter alia*, "parents of the juvenile whose dependency status is at issue." ***In the Intertest of L.C., II***, 900 A.2d 378, 381 (Pa.Super. 2006) (concerning right to attend and participate in dependency proceedings). Indeed, absent an operative order terminating parental rights, the effect of the 2017 goal change order permitted the agency to shift the focus of its services from reunification with Mother to adoption. ***See In re R.J.T.***, 9 A.3d 1179, 1186 n.9 (Pa. 2010) (acknowledging without endorsement Superior Court holding that goal change releases agency from obligation to supply additional reunification services). In this limited regard, because this Court vacated the termination decrees entered pending the remand hearing and further trial court action, we reject the trial court's determination that, "Mother [was] no longer a party to the dependency matter and ha[d] no standing to participate

in the dependency matter" when she sought to participate in permanency review. Trial Court Opinion, 6/25/19, at 22.

Nevertheless, insofar as Mother argues that the trial court improperly limited her ability to cross-examine Ms. Moy with respect to the permanency review hearing, no relief is due. As the trial court cogently explained, Ms. Moy's testimony related to L.R.J.P.'s and J.M.C.P.'s dependency proceedings, and the instant appeal from the February 27, 2019 orders concerns solely the adoption proceedings, *i.e.*, the children's legal interests and the propriety of the court's decision to reinstate the May 2, 2017 decree terminating Mother's parental rights. Indeed, both of the operative orders on appeal read, in pertinent part, "THE COURT FURTHER ORDERS: Invol[untary] termination decree of 5/2/17 is reinstated." Order, 2/27/19. Accordingly, the scope of Mother's participation in the permanency review portion of the hearing is not properly before us. *See In re Adoption of J.N.M.*, 177 A.3d 937, 947 (Pa.Super. 2018) (observing that because the "[m]other did not appeal any orders emanating from the juvenile court in [the c]hildren's dependency[,] all that is before us is the propriety of the orphans' court orders terminating parental rights. . . . We may not decide an issue that is not properly before us.").

Finally, we note that, in Mother's previous appeal, she asserted that the trial court erred in terminating her parental rights pursuant to § 2511(a)(1), (2), (5), and (b). To the extent that Mother intended to raise her previously-

- 21 -

unreviewed arguments in this appeal, we conclude that they lack merit. In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [47 A.3d 817, 826 (Pa. 2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Instantly, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re*

***B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we consider

§ 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

With respect to § 2511(a)(2), we explained,

> In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

- 23 -

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (cleaned up). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002) (cleaned up).

With regard to § 2511(b), we apply the following analysis:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Previously, Mother argued that there was insufficient evidence to establish that Mother refused or failed to perform parental duties, and contended that any conditions that led to the placement of L.R.J.P. and J.M.C.P. could be remedied. Mother's brief, 1664 EDA 2017, at 14. Characterizing L.R.J.P.'s and J.M.C.P.'s time in care as brief and exaggerating her progress toward completing the SCP goals, Mother claimed that DHS's evidence was insufficient to establish that the conditions that led to L.R.J.P.'s and J.M.C.P.'s placement could not be remedied within an acceptable amount of time. *Id*. at 15.

With respect to § 2511(b), Mother contended that powerful parent-child bonds existed between Mother and each of her sons. She highlighted evidence that L.R.J.P. and J.M.C.P. ran to her in excitement at visits, and, although the foster mother provided them with love and support, L.R.J.P. and J.M.C.P. wanted to return to Mother's home. *Id*. at 16. Mother asserted that there was little evidence produced of the emotional consequences of terminating her parental rights, and insufficient evidence that termination of Mother's parental rights would best meet the needs and welfare of L.R.J.P. and J.M.C.P. *Id*.

Mother's contentions do not merit relief. As set forth in the recitation of the evidence that DHS presented during the termination of parental rights hearings, the certified record confirms that the trial court did not err in involuntarily terminating Mother's parental rights pursuant to § 2511(a)(2) and (b).

- 25 -

Notably, the record demonstrates that Mother's compliance with her service plan goals was minimal. Mother made some modest gains within certain programs but she failed to address her substance abuse and mental health problems, and she did not complete the parenting or housing components of the plan. N.T. 11/14/16, at 15-19, 27-28. Similarly, even though Mother finished a domestic violence programs through ARC, she declined their offer to provide additional services to assist with employment and housing, both of which she still lacks. *Id*. at 62-65.

Mother's compliance did not improve over the course of the dependency proceedings. N.T., 2/16/17, 46-47. She eventually completed a parenting course and attended mental health treatment; however, the attending psychologist testified that she would require six additional months each of mental health treatment and substance abuse treatment before she could demonstrate the stability necessary to care for L.R.J.P. and J.M.C.P. *Id*. at 18, 27-31, 34, 38. Dr. Russel opined that Mother's completion of her still unresolved mental health and substance abuse problems is essential to reunification. *Id*. at 17-18.

As it relates to Mother's visitation requirement, the certified record supports the trial court's summarization of her lack of progression beyond supervised visitation.

> Mother had supervised visits at the agency with [the c]hildren, once a week for one hour. Mother did not progress to unsupervised visits at any point during the life of the case. Mother's visits with [the c]hildren were reduced from three hours to one hour a week because Mother was unable to keep [them]

under control during the visits. [L.R.J.P. and J.M.C.P.] know who Mother is, but [they] do not respect Mother when she tries to discipline them. Mother consistently attended visits[; however, she] often got emotional . . ., which in turn upset [the c]hildren as well. Mother was unable to show that she can manage [both of the c]hildren at the same time or keep them safe. CUA was unable to recommend unsupervised visits for Mother at the time of the termination trial. (N.T. 11/14/16, pgs. 19-20, 26, 67-70, 80; N.T. 02/16/17, pgs. 46, 57-58).

Trial Court Opinion, 6/25/19, at 16.

Our review of the testimony adduced during the termination preceding demonstrates that DHS satisfied its burden of proving the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(2). Stated plainly, the certified record reveals that despite DHS assistance, service, and programs, Mother cannot or will not remedy the continued parenting incapacity which caused L.R.J.P. and J.M.C.P. to be without the essential parental care, control, or subsistence necessary for their physical and mental well-being. Mother did not improve her parenting skills over the course of this case, and while she regularly attended the supervised visitations, she never demonstrated the capacity to care for the children without supervision.

Next, as it relates to the needs and welfare analysis pursuant to § 2511(b), the trial court found by clear and convincing evidence that no parent-child bond existed between Mother and either of her sons which would be detrimental to sever. It reasoned,

[Although L.R.J.P.] indicated that he wanted to return to Mother and Father's care, [he confirmed that he] would be okay with staying with the foster family. Children view Mother as more of a friend than a parent. Children are placed together in a safe, permanent, pre -adoptive home. Children appear comfortable in

- 27 -

the foster home. The foster parent indicated a willingness to maintain Children's relationship with their siblings. The foster parent meet all of Children's needs and go above and beyond for them. Children are treated as part of the foster family. The foster parents have a parent–child relationship with Children. Children have structure and discipline in the foster home and are much calmer. The foster parents also provide love, safety, and security for Children. The foster parents advocate for Children's needs. Children are receiving mental health therapy, which they attended weekly, and were doing well. (N.T. 11/14/16, pgs. 28, 31-34, 81-82; N.T. 02/16/17, pgs. 53-54; N.T. 03/10/17, pgs. 14-18, 21, 39-41). The trial court heard testimony that adoption is in Children's best interest and that neither of them would suffer irreparable harm if Mother's parental rights were terminated. (N.T. 11/14/16, pgs. 28; N.T. 02/16/17, pgs. 60-62; N.T. 03/10/17, pgs. 19-20). The DHS witnesses and the Child Advocate's witness were credible.

*Id*. at 20.

Moreover, the certified record demonstrates that the bonds that Mother shares with her sons, who are now ages twelve and eight, respectively, are more akin to bonds between friends than beneficial parent-child bonds that are founded on structure and mutual respect. N.T., 11/14/16, at 29-30, 79-80. In this vein, none of the professionals that testified about the children's needs and welfare opined that terminating Mother's parental right would cause irreparable harm to L.R.J.P. or J.M.C.P.

As the certified record supports the court's factual findings and the trial court's legal determinations are free of legal error, we do not disturb its analysis pursuant to § 2511(b). Succinctly stated, terminating Mother's parental rights best serves the children's developmental, physical and emotional needs and welfare.

For all of the foregoing reasons, we affirm the trial court orders reinstating its May 2, 2017 decrees involuntarily terminating Mother's parental rights to L.R.J.P. and J.M.C.P.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/24/20